UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RONALD MYERS,

                                        Plaintiff,

                    -v-

INSPECTOR MARY CHRISTINE DOHERTY,
LIEUTENANT SEAN CONRY, DEPUTY INSPECTOR
JAMES FRANCIS KOBEL, SERGEANT RICHARD
BEARY, and the CITY OF NEW YORK,

                                        Defendants.

---

21 Civ. 219 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves race discrimination and retaliation claims by a former New York City

Police Department ("NYPD") officer arising out of his employment.  Ronald Myers, who

worked for NYPD from 1995 to 2020, alleges that he was discriminated against because he is

African-American.  Myers sues the City of New York (the "City") and four individuals affiliated

with the NYPD (together, "defendants") under 42 U.S.C. § 1983 and the New York City Human

Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-101 *et seq.*

Pending now is defendants' motion to dismiss under Federal Rule of Civil Procedure

12(b)(6).  For the following reasons, the Court grants the motion to dismiss Myers's federal

claims and declines to exercise supplemental jurisdiction over Myers's state-law claims, which

are dismissed without prejudice.

## I.    Background

### A.    Factual Background[1]

#### 1.    The Parties

Myers is an African-American man who lives in New York.  AC ¶ 13.  He joined the NYPD in 1995.  *Id.* ¶ 18.

Defendant Mary Christine Doherty is an inspector in the NYPD.  *Id.* ¶ 14.  Defendant Sean Conry is a retired lieutenant with the NYPD.  *Id.* ¶ 15.  Defendant James Kobel is a retired deputy inspector with the NYPD.  *Id.* ¶ 16.  Defendant Richard Beary is a sergeant in the NYPD. *Id.* ¶ 17.[2]

#### 2.    Myers's Early Career at the NYPD

In March 1996, Myers began work at the NYPD's 28th Precinct in Harlem.  *Id.* ¶ 18.  He received awards and commendations, from the NYPD and the community, for his work over the next several years.  *Id.* ¶ 19.  In February 2002, Myers was promoted to sergeant and continued to receive awards.  *Id.* ¶ 20.  He held several posts, including as a supervisor.  *Id.*

#### 3.    2005: Allegations of Discriminatory Comments and Retaliation

In February 2005, Myers became a spokesperson in the office of the NYPD's Deputy Commissioner for Public Information.  *Id.* ¶ 21; *see also id.* ¶ 3.  He was the only Black sergeant

---

[1] These facts are drawn from the Amended Complaint and the exhibits attached thereto.  Dkt. 25 ("AC").  For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] Myers also brings claims, under the NYCHRL, against the City.  Defendants argue that a § 1983 claim against the City could not stand because the AC does not plead facts that suggest that the alleged violations were the result of a municipal policy or custom, as required by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), *see* Dkt. 30 ("Def. Mem.") at 4–5.  But as Myers notes, the AC does not bring § 1983 claims against the City.  *See* AC ¶¶ 56–57; Dkt. 33 ("Myers Opp'n") at 11.

in the Public Information unit. *Id.* ¶ 22. Myers worked with Doherty, who was also a sergeant. *Id.*

At that time, Doherty made comments in Myers's presence that, in his view, "denigrated the Black community." *Id.* In a reference to shootings and other crimes in predominantly Black communities, Doherty stated that crime was "always happening" with "these people" and that "you know how those people are"; she also "would refer to the Black community as 'ghetto.'" *Id.* Doherty was also annoyed at having to answer questions in her Public Information role about incidents in predominantly Black communities, because "it was plain to her that those incidents were to be expected." *Id.* Myers was offended by Doherty's comments. *Id.*

In June 2005, Doherty made another comment to which Myers objected as denigrating the Black community. *Id.* ¶¶ 3, 23–24. When a reporter called to ask for information about an incident in a predominantly Black community, in which a police officer had shot a pit bull, Doherty "referred to the dog as a 'ghetto dog.'" *Id.* ¶ 23. Myers took that comment to mean that pit bulls lived only in Black communities and that Black people did not have other pets. *Id.* Myers objected to Doherty's comments and told her "not all Black people have pit bulls" and "not all Black people shoot each other." *Id.* ¶ 24. Doherty rolled her eyes at Myers, who responded by telling her that he and Doherty were sergeants working in the same command and that she was "no better" than he was. *Id.*

Following that exchange, the AC alleges, Doherty retaliated against Myers. *Id.* ¶ 3. The day after the conversation with Doherty, Myers's supervisor, Chief Michael Collins, called Myers into his office and asked him about it. *Id.* ¶ 25. Chief Collins told Myers that although he had done nothing wrong, he was being transferred because of "politics" and should leave his job quietly. *Id.* The AC alleges that it was clear to Myers that Doherty was responsible for the

transfer, because she had "significant connections" with the NYPD administration, which enabled her to "orchestrate" Myers's transfer. *Id.* Myers was thereby forced to leave the Public Information unit, a "prestigious assignment," *id.* ¶ 3, and began working at the Manhattan South Task Force, *id.* ¶ 26. In that role, in 2009, Myers was promoted to Sergeant Special Assignment. *Id.* ¶ 27.

### 4.    2012: Allegations of Discipline

On January 31, 2012, Myers was transferred to NYPD's Counterterrorism Bureau, where Doherty was a supervisor. *Id.* ¶¶ 4, 28. At that point, Myers's supervisor was Lieutenant Kevin Lee. *Id.* ¶ 28. The AC alleges that Myers performed well in several roles in the Counterterrorism Bureau. *Id.* ¶ 29.

In July 2012, Doherty, by then a captain in the Counterterrorism Bureau, came to Myers's office and directed Lieutenant Lee to discipline Myers because Myers's official vehicle had been towed while he was working. *Id.* ¶ 31. This happened frequently to NYPD's Counterterrorism officers but discipline was otherwise never imposed for such infractions. *Id.* After Myers appealed the disciplinary action to his commanding officer, it was vacated. *Id.*

### 5.    2016–2017: Allegations of Lowered Performance Evaluations and Disciplinary Action

In May 2014, Doherty became Myers's commanding officer. *Id.* ¶ 32; *see also id.* ¶ 4. In April 2016, when Myers received his 2015 performance evaluation, on a one-to-five scale, the scores were not his typical fours and fives. *Id.* ¶ 33. Although Myers's performance had not deteriorated, Myers now received threes and fours. *Id.* Myers's supervisor, Conry, who had given Myers a "far more positive evaluation" the year before, "indicated that Defendant Doherty was responsible for the lowered evaluations," but told Myers he should not worry about it. *Id.*

In 2017, Conry again gave Myers a less favorable review and "again indicated that Defendant Doherty was responsible." *Id.* ¶ 34. Conry discouraged Myers from appealing the evaluation and said he would convene a meeting to address the problem. *Id.*

On June 17, 2017, Myers met with Doherty, Conry, and a union delegate. *Id.* ¶ 35. Doherty told Myers that she was disciplining him for changing his schedule, even though white supervisors often changed their schedules and were not disciplined for it. *Id.* Doherty told Myers that she would discipline him more severely if he did not accept this disciplinary action. *Id.* Myers's union delegate told him to accept the discipline, and so Myers did. *Id.* ¶ 36. As his punishment, Myers chose to lose a month of overtime rather than transfer out of the Counterterrorism Bureau. *Id.*

### 6. 2018–2020: Alleged Incidents of Discrimination, Harassment, and Retaliation

#### a. September 2018 Discrimination

On September 5, 2018, Doherty told Myers he could no longer use the bathroom that Doherty and other white supervisors used because Doherty used it. *Id.* ¶¶ 4, 37. When Myers objected, Doherty told him, "I see you wearing bow ties and going to De Blasio fundraisers, you think you're something, you're nothing." *Id.* ¶ 37.

During this period, Doherty gave Myers menial tasks unrelated to work and gave him "hostile looks" and otherwise ignored him, even though she was friendly with Myers's white colleagues. *Id.* ¶¶ 37–38. Doherty also denied another Black supervisor, Lieutenant Damian Brooks, a schedule change even though she routinely allowed white supervisors to change their schedules. *Id.* ¶ 39.

### b. *October 2019 Potential Transfer*

On October 15, 2019, Conry and Doherty met with Myers and told him that he would be transferred from the Counterterrorism Bureau to a precinct assignment, which would prevent him from both advancing further at the NYPD and finding adequate post-NYPD employment. *Id.* ¶¶ 5, 40. The transfer was allegedly prompted by Myers's having written an email to the Chief of the Counterterrorism Bureau that was "insufficiently detailed," even though the AC alleges that the email had all the information for which the Chief had asked. *Id.* ¶¶ 40–41. At the October 15, 2019 meeting, Myers told Doherty and Conry that such a transfer would be discriminatory; said that Doherty had always had a problem with Black people and that "she had never gotten over his objection to her racist comment many years ago"; and sarcastically congratulated Doherty and Conry for "getting rid of all the Black supervisors in the unit." *Id.* ¶ 46.

Doherty's "rationale for the transfer was wholly pretextual," *id.* ¶ 5, and for "essentially no reason," *id.* ¶ 42. By contrast, white personnel in the Counterterrorism Bureau under Doherty's command "engaged in serious acts of misconduct," but were not transferred or otherwise disciplined. *Id.* ¶¶ 5, 42.

The transfer never occurred because, as set out below, Myers elected first to retire. The AC terms the announcement of the coming transfer an adverse employment action because (1) Myers's responsibilities as a precinct sergeant would have been "materially less prestigious, and less suited to the skills and experience" that Myers had developed; (2) Myers would have lost guaranteed overtime; (3) Myers would no longer be promoted within the NYPD; and (4) Myers's "chances of finding lucrative employment" after the NYPD would be diminished. *Id.* ¶¶ 43–45.

### c. October 2019 Complaint

After meeting with Myers and Doherty about Myers's transfer, Conry contacted the NYPD's Equal Employment Opportunity Division ("EEOD"). *Id.* ¶ 47. An EEOD investigator then asked Myers if he would like to make a complaint; on October 16, 2019, Myers did so. *Id.* ¶ 48. An EEOD supervisor, Beary, told Myers that he would assign an investigator to Myers's complaints. *Id.* ¶¶ 6, 48. But no investigator was ever assigned and no investigation ever took place. *Id.* ¶¶ 6, 49.

On November 22, 2019, Myers learned that Doherty was going to be promoted. *Id.* ¶ 50. Because he understood that NYPD policy prevented the promotion of subjects of pending investigations, Myers concluded "that no good faith investigation was going to take place." *Id.* On November 26, 2019, Beary sent Myers an email attaching a letter from Kobel, dated November 20, 2019, finding no evidence of employment discrimination. *Id.* ¶ 51; *see also id.* ¶ 7. Myers emailed Beary asking about the investigation and never got a response, which "reinforced that no investigation was actually conducted." *Id.* ¶ 52. In December 2020, Kobel was relieved of his command for making offensive comments online. *Id.* ¶¶ 7, 53.

After the investigation closed, Myers had the ability to avoid a transfer if he retired on June 30, 2020. *Id.* ¶¶ 54–55. The AC alleges that Myers then retired—some five years before he had intended to do so, costing him wages and benefits. *Id.* ¶¶ 8, 55.

Myers alleges continuing repercussions from the discrimination and retaliation he claims. Specifically, he was told by a corporate security director that Conry had said not to associate with him because Myers was "bad news." *Id.* ¶ 56. Without informal recommendations from his former colleagues, Myers alleges, he likely will be unable to secure private sector employment. *Id.*

### B.   Procedural History

On January 11, 2021, Myers filed his original complaint. Dkt. 1. On May 19, 2021, defendants moved to dismiss under Rule 12(b)(6). *See* Dkts. 19–21. On May 21, 2021, the Court ordered Myers to file an amended complaint or oppose the motion to dismiss. Dkt. 22.

On June 24, 2021, Myers filed the AC. Dkt. 25. In it, Myers brings § 1983 claims against Doherty, Conry, Kobel, and Beary, claiming discrimination and harassment in violation of the Equal Protection Clause of the Fourteenth Amendment based on his race; retaliation against him for objecting to race discrimination; and, with respect to Kobel and Beary, failing to intervene to stop harassment, discrimination, and retaliation by the other defendants. He also brings claims against these defendants, and the City, under the NYCHRL for racial discrimination and retaliation (and, as to Kobel and Beary, for aiding and abetting the other defendants' race discrimination and retaliation).

On August 16, 2021, defendants filed the instant motion to dismiss, Dkt. 29, and a memorandum of law in support, Dkt. 30 ("Def. Mem."). On September 13, 2021, Myers filed a memorandum of law in opposition. Dkt. 33 ("Myers Opp'n"). On October 1, 2021, defendants filed a reply. Dkt. 36 ("Def. Reply").

## II.   Applicable Legal Standards

### A.   Motions to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). By contrast, a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal

quotation marks and alterations omitted).  Such factual enhancement is necessary to "nudge[] [a]

claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Although this standard "does not impose a probability requirement at the pleading stage,"

it does require a complaint to plead "enough fact[s] to raise a reasonable expectation that

discovery will reveal evidence" to support plaintiff's claims.  *Id.* at 556.  Where a complaint fails

to do so, "[t]his basic deficiency should be exposed at the point of minimum expenditure of time

and money by the parties and the [C]ourt."  *Id.* at 558 (ellipsis omitted) (quoting 5 Wright &

Miller, Federal Practice and Procedure § 1216).  Otherwise, "the threat of discovery expense will

push cost-conscious defendants to settle even anemic cases before reaching those proceedings."

*Id.* at 559.  "Determining whether a complaint states a plausible claim for relief [is] . . . a

context-specific task that requires the [Court] to draw on its judicial experience and common

sense.  But where the well-pled facts do not permit inferring more than the mere possibility of

misconduct, the complaint has not shown an entitlement to relief and must be dismissed. *Iqbal*,

556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (citation omitted).  Although the Court must

accept as true all well-pled factual allegations and draw all reasonable inferences in the

plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is

inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

### B.    Section 1983

Section 1983 provides redress for a deprivation of federally protected rights by persons

acting under color of state law.  To prevail on a § 1983 claim, a plaintiff must establish (1) the

violation of a right, privilege, or immunity secured by the Constitution or laws of the United

States (2) by a person acting under the color of state law.  Once action under color of state law is

established,[3] an "equal protection claim parallels" a Title VII claim: "The elements of one are generally the same as the elements of the other and the two must stand or fall together." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (citing *Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998) ("In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims."); *Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996)).

## III.   Discussion

The Court here addresses Myers's claims under § 1983, analyzing, first, defendants' arguments that some of these are untimely, and, next, defendants' arguments that the timely claims are deficiently pled.  Because the Court does not find any viably pled § 1983 claim, the Court considers whether to exercise supplemental jurisdiction over Myers's state-law claims—and determines not to do so.

### A.  Claims Based on Conduct Before January 11, 2018

Defendants argue that to the extent Myers's claims are based on conduct before January 11, 2018—three years before Myers's original complaint—they are time-barred.  Def. Mem. at 11.  Myers counters that he has alleged a continuing violation, such that claims arising from pre-January 11, 2018 conduct are viable.  Myers Opp'n at 18–19.  Defendants are correct.

#### 1.    Applicable Law

"The statute of limitations for a § 1983 arising in New York is three years." *Lawson v. Rochester City Sch. Dist.*, 446 F. App'x 327, 328 (2d Cir. 2011) (summary order) (citing

---

[3] Because the actions alleged in the AC are attributable to NYPD officers, that requirement is satisfied. *See, e.g.*, *Edwards v. Khalil*, No. 12 Civ. 8442 (JCM), 2016 WL 1312149, at *22 (S.D.N.Y. Mar. 31, 2016) (citing *Carmichael v. City of New York*, 34 F. Supp. 3d 252, 260 (E.D.N.Y. 2014) ("Because there is no dispute that the actions or inactions at the heart of this case are attributable to state actors, *i.e.*, officers of the NYPD, the state action element is satisfied."), *appeal dismissed*, No. 14-3142 (2d Cir. Dec. 22, 2014)).

*Cloverleaf Realty v. Town of Wawayanda*, 572 F.3d 93, 94 (2d Cir. 2009)); *Sareen v. Port Auth. of N.Y. & N.J.*, No. 12 Civ. 2823 (PAE), 2013 WL 6588435, at *8 (S.D.N.Y. Dec. 16, 2013), *aff'd*, 592 F. App'x 34 (2d Cir. 2015) (summary order). There is an exception to the three-year statute of limitations for continuing violations. Under Title VII, "[w]hen a plaintiff experiences a continuous practice and policy of discrimination, the commencement of the statute of limitations may be delayed until the last discriminatory act in furtherance of it." *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (cleaned up). But the statute "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). Such acts include "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114. Justice Ginsburg explained the rationale for not treating such acts as timely under the continuing violations doctrine:

> A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext.

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 649 (2007) (Ginsburg, J., dissenting).

### 2.    Analysis

The AC alleges several incidents before January 11, 2018, namely: (1) comments Doherty made to Myers in 2005; (2) retaliation by Doherty against Myers following his resistance to her comments in 2005; (3) disciplinary action (later vacated) in 2012; (4) reduced performance evaluations in 2016 and 2017; and (5) disciplinary action against Myers in 2017. But the AC does not plead facts making the continuing violations doctrine applicable to these otherwise untimely acts. It does not allege a "continuous practice and policy of discrimination," *Cornwell*, 23 F.3d at 703. Instead, as pled, there is a substantial gap in time between the alleged

11

acts, and these disparate acts as pled are "discrete" as opposed to marking a continuous policy, *Morgan*, 536 U.S. at 105.

To begin, the AC alleges gaps measured in years between most of the above episodes. The allegedly discriminatory conduct that Myers claims to have experienced in 2005 and 2012 is six (and more) years removed from the 2018–2020 conduct that is within the limitations period, and as such is not plausibly pled as a unitary continuing violation. Even assuming that each individual act was plausibly pled as one of unlawful discrimination, the AC does not plead a policy and practice unifying the acts spanning 2005 and 2012, or linking these to the acts during 2018–2020. *Cf. Annis*, 136 F.3d at 246 (holding that discrimination experienced "before and after [a six-year] gap cannot be joined as a 'continuing violation'") (collecting cases).

Moreover, as to the years before 2018, the AC alleges only discrete and finite acts of the sort described by Justice Ginsburg as ill-suited to the continuing violations doctrine. For example, it alleges that, in 2016 and 2017, Myers's performance evaluations contained less favorable scores and that disciplinary action was taken against him. Myers was allegedly told about his reduced performance evaluation and that Doherty was responsible for it; similarly, as to the acts of discipline, Doherty also allegedly told Myers that he was being disciplined for these and why. AC ¶¶ 33–35. As pled, Myers knew immediately of the actions, which were of "open and definitive character." *See Ledbetter*, 550 U.S. at 649 (Ginsburg, J., dissenting). They are not the sort of "ongoing circumstances that combine to form a single violation that 'cannot be said to occur on any particular day.'" *Deters v. City of Poughkeepsie*, 150 F. App'x 10, 12 (2d Cir. 2005) (summary order) (quoting *Morgan*, 536 U.S. at 115). And "[d]iscrete acts of this sort, which fall outside the limitations period, cannot be brought within it." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012); *see also, e.g., Valtchev v. City of New York*, 400 F.

App'x 586, 589 (2d Cir. 2010) (summary order) ("[N]egative evaluations . . . do not trigger the continuing violation exception."); *Washington v. Cnty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (filing of disciplinary charges against plaintiff correctional officers cannot toll statute of limitations under continuing violation doctrine); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997) ("Completed acts such as a . . . job transfer . . . are not acts of a continuing nature.") (internal quotation marks omitted).

Myers accordingly cannot stitch the discrete acts he alleges from before January 11, 2018, together with acts thereafter into a singular continuing violation. The Court therefore dismisses as untimely all federal claims based on conduct before that date.

### B.   Discrimination Claims

To plead a *prima facie* case of employment discrimination under § 1983, a plaintiff must plead that: "(1) he belonged to a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Allen v. Murray-Lazarus*, 463 F. App'x 14, 16 (2d Cir. 2012) (summary order) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). Defendants argue that, as to Myers's discrimination claim, the AC fails to plead the latter two elements. Defendants are correct.

#### 1.   Adverse Employment Action

An adverse employment action is a "*materially significant disadvantage* with respect to the terms of the plaintiff's employment," *Littlejohn v. City of New York*, 795 F.3d 297, 312 n.10 (2d Cir. 2015) (emphasis in original) (cleaned up), or "a materially adverse change in the terms and conditions of employment," *Sanders v. N.Y. City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks omitted). Examples of such actions include termination; a demotion with a decrease in wage or salary; a less distinguished title; a material loss of benefits;

13

or significantly diminished material responsibilities. *Littlejohn*, 795 F.3d at 312 n.10; *Sanders*, 361 F.3d at 755. Such an action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Sanders*, 361 F.3d at 755 (quoting *Terry*, 336 F.3d at 138). A negative evaluation or official reprimand "may, in some circumstances, constitute adverse employment action," *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (summary order) (collecting cases), but only when it "trigger[s] negative consequences to the conditions of employment," *Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 469 (S.D.N.Y. 2013).

The AC alleges that when Conry and Doherty told Myers that he would be transferred to another unit, that notification qualified as an adverse employment action. It so alleges on the grounds that, following the transfer, Myers's responsibilities would have been less prestigious and less suited to his skills and experience, that he would have lost guaranteed overtime, that he would no longer be promoted at NYPD, and that his chances of finding lucrative post-NYPD employment might have been reduced. AC ¶¶ 43–45.

A transfer to a lower-status post carrying materially reduced benefits is indeed generally held to qualify as adverse employment action. *See, e.g.*, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (involuntary transfer may constitute adverse employment action "if the plaintiff 'show[s] that the transfer created a materially significant disadvantage' with respect to the terms of her employment") (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.2d 636, 641 (2d Cir. 2000)); *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206–07 (2d Cir. 2006) (transfer may be an adverse employment action if, *inter alia*, "it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career" or "the plaintiff was transferred from an elite unit to one that was less prestigious") (cleaned up); *see also Smith*

*v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 330 (S.D.N.Y. 2020) (collecting cases).  In Myers's case, however, no such transfer ever took place.  Instead, the AC alleges, Myers continued to work in his job for another eight and one half months—from October 15, 2019 until June 30, 2020—and at that point retired, never having been transferred or demoted.  AC ¶¶ 40, 54–55.

The Court is unaware of authority that notification of such a transfer, where the transfer does not materialize, qualifies as an adverse employment action.  As noted, for such an action to occur, there must have been a "materially adverse *change* in the terms and conditions of employment."  *Sanders*, 361 F.3d at 755 (emphasis added) (internal quotation marks omitted).  The AC does not allege that Myers's conversation with Conry and Doherty, prefiguring a future transfer, marked any such change or in any tangible way had "a cognizable or material impact on the terms of conditions of [Myers's] employment."  *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000).  On the contrary, the only allegation the AC makes of any alteration in Myers's employment circumstances between Myers's October 15, 2019 meeting with his supervisors and his June 30, 2020 voluntary retirement is that Myers spent "much of the time . . . out of the office using accrued vacation time."  AC ¶ 54.  But that behavior, even if bespeaking an expected transfer, does not mark an adverse employment action.  "In this Circuit, an action must actually occur to be considered an adverse employment action."  *Durkin v. Verizon New York, Inc.*, 678 F. Supp. 2d 124, 139 (S.D.N.Y. 2009) ("[r]ather than be demoted and have her salary reduced," plaintiff "instead chose to take a final leave of absence," so no adverse employment action resulted); *see also Thomas v. Bergdorf Goodman, Inc.*, No. 03 Civ. 3066 (SAS), 2004 WL 2979960, at *10 (S.D.N.Y. Dec. 22, 2004) ("The mere threat of

disciplinary action, including the threat of termination, does not constitute an adverse action materially altering the conditions of employment.").

The cases on which Myers relies are not to the contrary. In *Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012), the plaintiff was removed from her position by her employer. *Id.* at 169. In *Pease v. City of New York*, the plaintiff employee was reassigned. No. 19 Civ. 7693 (KPF), 2021 WL 2651400, at *10 (S.D.N.Y. June 28, 2021). And, in *Moore v. Metropolitan Transportation Authority*, the plaintiff asserted that denying his request to transfer was an adverse employment action. 999 F. Supp. 2d 482, 497 (S.D.N.Y. 2013). Not so here. As alleged, Myers sought to avoid a transfer that never took place.

Nor does Myers's election to retire, on the facts pled, make the transfer notice an adverse employment action. To do so, the notice of Myers's eventual transfer would have had to rise to the level of a constructive discharge. "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry*, 336 F.3d at 151–52 (citing *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998); *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). To state a *prima facie* case of constructive discharge, a plaintiff "must establish that the constructive discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in a protected class." *Terry*, 336 F.3d at 152 (cleaned up). That causal connection may be established directly, "through evidence of retaliatory animus directed against a plaintiff," or indirectly, "by showing

that the protected activity was followed closely by discriminatory treatment," including disparate treatment of fellow employees. *Id.* (cleaned up).

Here, the AC does not plead facts describing a constructive discharge. It alleges merely that "Myers, with no other options, agreed with Defendant Doherty that he could avoid a transfer" if he retired earlier than planned. AC ¶ 54; *see* Myers Opp'n at 13 ("Involuntary retirements are considered adverse employment actions."). But constructive discharge requires working conditions to be objectively "so intolerable" that a reasonable person "would have felt compelled to resign." *Suders*, 542 U.S. at 141. The AC does not plead conditions of this level. It alleges that Myers's working relationship with Doherty was unpleasant, including because Myers could no longer use a certain bathroom that Doherty used as of September 5, 2018, AC ¶ 37, and because Doherty gave Myers hostile looks and otherwise ignored him, *id.* ¶ 38. But these slights, even viewed in conjunction with the October 25, 2019 meeting announcing a forthcoming transfer, do not describe work environment so intolerable as to force Myers's resignation. *See Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985) (plaintiff could not sustain constructive discharge claims based on allegations that she had resigned because her supervisor embarrassed her in front of colleagues, unfairly criticized her, and interfered with her ability to perform her duties).

Salient too, Myers's retirement, in June 2020, occurred at least eight months after his meeting with Doherty and Conry in October 2019, and close to two years after Doherty first told Myers in September 2018 that he could no longer use Doherty's bathroom. Those facts undercut any claim of constructive discharge. *See Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 427–28 (S.D.N.Y. 2018) (finding "seven-month gap" between allegedly discriminatory and retaliatory action and resignation to belie constructive discharge claim); *Arroyo v. WestLB*

*Admin., Inc.*, 54 F. Supp. 2d 224, 231 (S.D.N.Y. 1999) ("several random incidents of discriminatory conduct that occurred over a twenty-five month period" could not establish constructive discharge).  The AC therefore fails to state that Myers was constructively discharged.

The cases Myers cites that involved involuntary retirement are again inapposite.  In *Giordano v. City of New York*, the plaintiff was compelled to retire from duty at the NYPD after being found physically unfit to work as a result of being diagnosed with an aneurysm and beginning to take a daily anticoagulant.  274 F.3d 740, 745–46 (2d Cir. 2001).  In *Giacopelli v. Incorporated Village of Malverne*, the defendant "filed retirement papers on behalf of the [p]laintiff," and the plaintiff "subsequently filed his own retirement papers."  829 F. Supp. 2d 131, 142 (E.D.N.Y. 2011).  That court found a genuine issue of material fact whether the defendant's unilateral retirement filing was an adverse employment action.  *Id.*  Here, in contrast, the AC makes no similar allegations to the effect that defendants dictated Myers's retirement.  Instead, it alleges merely that Myers retired rather than transfer to another position.  *See* AC ¶¶ 54–55.  Because defendants are not alleged to have decided that Myers was unfit for his position or filed retirement papers on Myers's behalf, these authorities do not avail Myers here.

In sum, the AC does not plead an adverse employment action, and thus does not plead a *prima facie* case for discrimination under § 1983.

### 2.    **Inference of Discriminatory Motivation**

Even assuming the notice of the transfer itself was an adverse employment action or that it worked a constructive discharge of Myers, the AC fails to state claim for a separate reason.  It does not allege facts giving rise to an inference of discriminatory motivation.

An inference of such motivation may arise from circumstances including, but not limited to, an employer's (1) criticism of the employee's performance in ethnically degrading terms, (2)

invidious comments about others in the employee's protected group, (3) favorable treatment of employees not in the protected group, and (4) replacing a terminated or demoted employee with an individual outside the employee's protected class. *See Littlejohn*, 795 F.3d at 312–13. Where a plaintiff alleges invidious comments, the significance of those comments depends on the context in which they were made and whether, fairly considered, they reveal discrimination or "tend[] to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 116 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Courts refuse to find an inference of discrimination absent some evident contextual link to a protected characteristic. *See, e.g., Williams v. Time Warner Inc.*, 440 F. App'x 7, 9–10 (2d Cir. 2011) (summary order).

Alternatively, "[a] plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably," but "[i]n order to make such a showing, the plaintiff must compare herself to employees who are 'similarly situated in all material respects.'" *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)); *see also Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). "[S]imilarly situated in all material respects does not mean all respects generally, but rather sufficiently similar 'to support at least a minimal inference that the difference of treatment may be attributable to discrimination.'" *Hernandez v. City of New York*, No. 11 Civ. 3521 (SJ) (RER), 2013 WL 593450, at *4 (E.D.N.Y. Feb. 13, 2013) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001)).

Here, in pursuing an inference of discriminatory motivation, Myers relies on comments Doherty made to him and on allegations about the treatment of ostensibly similarly situated employees. Neither set of allegations plausibly alleges discriminatory motivation.

  a.    *Comments by Doherty*

The AC cites sparse comments in support of its claim of race-discriminatory motives by Doherty. It alleges that Doherty told Myers he could not use a bathroom that Doherty "and other white supervisors used." AC ¶ 37. Critically, however, the AC does not attribute those words to Doherty. Instead, it alleges, without quoting the conversation, that Doherty told Myers he could not use that bathroom "because she herself used it." *Id.* ¶ 4. That alone does not suggest *discriminatory* animus on the part of Doherty. It implies that Doherty did not want to share a bathroom with Myers. But, without additional factual allegations, that other white supervisors used the same bathroom does not make Doherty's ban on Myers's use of it race-based. Nor does Doherty's alleged comment to Myers, that "I see you wearing bow ties and going to De Blasio fundraisers, you think you're something, you're nothing," *id.* ¶ 37, without more, have racial overtones. The AC simply does not explain "how these words, in context, functioned as coded appeals to racial stereotypes." *LeeHim v. New York City Dep't of Educ.*, No. 17 Civ. 3838 (PAE), 2017 WL 5634128, at *7 (S.D.N.Y. Nov. 21, 2017) (dismissing race discrimination claims where neither complaint nor plaintiff's brief explained how the words "aggressive," "young," and "not a team player" were racially charged); *see also, e.g.*, *Thelwell v. City of New York*, No. 13 Civ. 1260 (JGK), 2015 WL 4545881, at *11 (S.D.N.Y. July 28, 2015) (use of words "angry" and "abrasive" could not support Title VII claim absent context-specific evidence that the words amounted to racial "code words"), *aff'd*, 733 F. App'x 561 (2d Cir. 2018); *Humphries v. City Univ. of N.Y.*, No. 13 Civ. 2641 (PAE), 2013 WL 6196561, at *9 (S.D.N.Y. Nov. 26, 2013) (use of words such as "belligerent," "hostile," and "aggressive" could not support

inference of discrimination absent "other concrete factual allegations" suggesting discriminatory motive).

      *b.*    *Similarly situated employees*

Defendants also argue that the AC, while conclusorily so stating, fails to plead that any similarly situated employees who were not Black received preferential treatment. *See* Def. Mem. at 7–8. That is correct. The AC does not allege facts from which a non-speculative inference of race discrimination could be drawn. It alleges that "[m]any white officers . . . had engaged in serious misconduct . . . without being transferred or otherwise disciplined." AC ¶ 42. Leaving aside that Myers was also not transferred, that broad generalization does not draw a well-pled contrast between Myers's treatment and that of similarly situated comparators. Critically, the AC does not set out the factual basis for these conclusions, including who the white officers were or what their responsibilities were. It therefore does not supply a basis to contend that the white officers were similarly situated to Myers, save that they were also supervised by Doherty. *See, e.g., Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014); *Thompson v. New York City*, No. 12 Civ. 8034 (PAE), 2013 WL 6409326, at *10 (S.D.N.Y. 2013) (granting motion to dismiss where, *inter alia*, complaint was "woefully unspecific about . . . proffered comparators" and "fails to state facts that would allow a court to infer [plaintiff] was treated differently based on race"); *Gillman v. Inner City Broad. Corp.*, No. 08 Civ. 8909 (LAP), 2009 WL 3003244, at *6 (S.D.N.Y. Sept. 18, 2009) (granting motion to dismiss where plaintiff alleging age discrimination did not plead any "information about the reasons for [comparators'] termination or specific employment practices").

Notably, Myers's brief does not explain why either the sparse comments attributed to Doherty or the generalizations about her treatment of white officers reasonably give rise to an inference of racial discrimination. Instead, Myers there declares that "Doherty made racially

insensitive remarks" to Myers in 2005; she treated him worse than white colleagues in 2012; and she "continued to harbor that bias . . . in 2018 and 2019," as evidenced by her "singling him out" for discipline and "eventually ordering him transferred based on trivial errors." Myers Opp'n at 14. In any case, the viability of a plaintiff's claims is measured by his complaint, not his legal brief. And the AC here does not plead facts that give rise to a plausible inference of racially discriminatory motivations. For that independent reason, Myers's discrimination claim must be dismissed.[4]

### C.    Retaliation

Defendants also move to dismiss the AC's retaliation claim. Myers's retaliation claim indeed fails, because it does not allege either an adverse employment action or a causal relationship between such an action and a complaint about discrimination.

#### 1.    Applicable Law

"[T]he elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015). For a retaliation claim under § 1983 to survive a motion to dismiss, a plaintiff "must plausibly allege that: (1) defendants acted under color of state law, (2) defendants took adverse employment action against him, (3) because he complained of or otherwise opposed

---

[4] The AC also pleads that another Black supervisor was mistreated. AC ¶ 39. But, as defendants rightly note, that conclusory claim about a co-worker's treatment does not support a claim of discriminatory motivation. *Cf. Vaughn v. City of New York*, No. 06 Civ. 6547 (ILG), 2010 WL 2076926, at *11 (E.D.N.Y. May 24, 2010); *Dorfman v. Doar Commc'ns, Inc.*, 314 F. App'x 389, 391 (2d Cir. 2009) (summary order) ("With respect to Appellant's generalized allegations about other individuals in the protected age group being fired, he fails to provide demographic and other information necessary to analyze this data, without which his allegations 'ha[ve] no logical tendency to show that discrimination was present.'") (quoting *Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115, 123 (2d Cir. 1997)).

discrimination." *Id.*; *see also, e.g., Garcia v. NYC Health & Hosps. Corp.*, No. 19 Civ. 997 (PAE), 2019 WL 6878729, at *15 (S.D.N.Y. Dec. 17, 2019).

### 2.    Analysis

The retaliation claim fails for two separate reasons.

First, as explained above, the AC does not plead an adverse employment action, because Myers was never transferred from his position or, as pled, constructively discharged.

Second, even assuming Doherty and Conry's verbal notice of a future potential transfer qualified as an adverse action, the AC does not plead facts plausibly alleging a causal relationship between Myers's opposition to discrimination and that action. Myers seeks to avoid this problem by attempting to broaden the category of cognizable adverse acts, emphasizing, *inter alia*, the AC's allegation that Myers resisted Doherty's comments in 2005 and was later transferred, AC ¶¶ 23–26, and Doherty's overall conduct towards him between 2012 and 2019, culminating in Doherty's statements about a possible transfer, *id.* ¶¶ 31, 33–40. Myers Opp'n at 15. But, as noted, any claims based on conduct, including acts of retaliation, before January 11, 2018 are time-barred under § 1983. Thus, the transfers and disciplinary action that the AC alleges occurred before that date cannot be the basis of a retaliation claim.

As to the October 2019 meeting, and even assuming it constituted an adverse employment action, the AC does not plead facts connecting Myers's earlier protected conduct, such as the 2005 complaint, to the 2019 meeting. The AC does not plead facts drawing an explicit nexus between these distant events (*e.g.*, a defendant's statement tying the latter to the former). And where a complaint alleges only temporal proximity as the basis for inferring causation, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d

257, 275 (S.D.N.Y. 2007) (collecting cases); *see Sareen*, 2013 WL 6588435, at *14–15 (holding a year and a half too attenuated, and collecting cases). Nor does Myers's 2019 filing of a complaint with the EEOD, AC ¶ 48, plausibly allege protected activity that prompted the adverse action here. That is so because the notice to Myers of potential transfer—the alleged adverse action—predated that activity, *see id.* ¶¶ 40, 46.

The cases cited by Myers are, again, easily distinguished. In *Grant v. Bethlehem Steel Corp.*, the plaintiffs pled retaliatory activity taken against them—a lack of referrals to them for business—that occurred continuously over a period of years. 622 F.2d 43, 45–46 (2d Cir. 1980). Here, in contrast, as pled, there was a several-year gap between Myers's alleged protected activity of resisting Doherty's alleged comments and the one timely alleged adverse action. In *Raymond v. City of New York*, a delayed adverse reaction was held causally related, as pled, to a protected activity, but even there, a time interval of "over ten months after filing of the complaints" was held to "not allow for an inference of causation." 317 F. Supp. 3d 746, 769 (S.D.N.Y. 2018). And the gap here as pled far exceeded 10 months.

Because the AC does not plausibly plead either a timely adverse employment action or a causal relationship between protected activity and such action, the Court dismisses the retaliation claim under § 1983.

### D.      Hostile Work Environment

Defendants also move to dismiss any hostile work environment claim, while noting that the AC does not, explicitly, articulate such a claim. Def. Mem. at 12–13; Def. Reply at 7–8. Reading the AC in the light most favorable to Myers, the Court construes it to bring such a claim, based on Doherty's actions, as Myers argues it does. *See* Myers Opp'n at 17–18 (AC "clearly establishes a hostile work environment under federal law . . . ."); AC ¶ 57 (alleging race-based harassment at work); *see also Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240

(2d Cir. 2007) ("Although the complaint does not explicitly allege discrimination based on a hostile work environment, the complaint alleges 'continued harassment' of Kassner and alleges facts from which we may infer pleading of hostile work environment claims[.]"). This claim, however, fails, because the facts do not make state a plausible such claim.

### 1.     Applicable Law

To state a claim, a hostile work environment claim must be plausible by both objective and subjective measures. "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).

"In determining whether a plaintiff suffered a hostile work environment," a court "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Love v. Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 253 (E.D.N.Y. 2016) (quoting *Littlejohn*, 795 F.3d at 321). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Terry*, 336 F.3d at 148 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). That said, on the pleadings, the Second Circuit has "cautioned against setting the bar too high" for such claims. *Id.* To survive a motion to dismiss, a complaint must allege facts plausibly showing that the plaintiff "was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (alterations in original) (quoting *Terry*, 336 F.3d at 148).

## 2.    Analysis

The AC fails to clear even that low bar.  The following are the sole factual allegations it makes in support of a potential hostile work environment claim: (1) Doherty told Myers that he could no longer use the bathroom that Doherty and other white supervisors used; (2) Doherty castigated Myers, saying, "I see you wearing bow ties and going to De Blasio fundraisers, you think you're something, you're nothing;" (3) Doherty "made a point" of directing Myers "to perform non-work-related menial tasks for her;" and (4), "[o]n a daily basis," Doherty "singled out" Myers "for harassment, giving him hostile looks but otherwise making a point of ignoring him even though she was friendly" with Myers's white colleagues.  AC ¶¶ 37–38.

For multiple reasons, these threadbare allegations fall well short of pleading a hostile work environment based on race.  They lack the pervasiveness required of such a claim, they do not plead an alteration in the conditions of Myers's employment, and they fail to plausibly allege that the harassment alleged derived from a protected characteristic such as race.

The Court first puts aside as ill-pled the AC's general and conclusory allegations about unspecified menial tasks and "hostile looks."  Remaining is the allegation that Doherty made a comment belittling to Myers and embarrassed him by restricting his use of a bathroom.[5]  But such behavior, even if unpleasant, does not rise to the level of a hostile work environment, as the case law underscores.  In *Littlejohn*, *supra*, for example, the plaintiff claimed a hostile work environment based on, *inter alia*, "negative statements," the impatience and "harsh tones" of her supervisor, her supervisor's physically distancing herself from the plaintiff, declining to meet with the plaintiff, requiring the plaintiff to recreate logs, and reprimanding and using sarcasm

---

[5] The comments that the AC alleges were made to Myers in February and June 2005, AC ¶¶ 22–23, are far too old, and disconnected from the conduct within the limitations period, to plausibly be claimed to form a continuous course of conduct. *See Szuszkiewicz v. JPMorgan Chase Bank*, 12 F. Supp. 3d 330, 339 (E.D.N.Y. 2014).

toward the plaintiff. 793 F.3d at 321. However, the Second Circuit held, this assembled conduct "could not support a finding of hostile work environment that is so severe or pervasive as to have altered the conditions of Littlejohn's employment," and therefore affirmed the dismissal of such a claim. *Id.*

The AC alleges far less here. At most, it pleads Doherty's castigation of and coldness towards Myers in the workplace, and her imposition on Myers of unspecified menial tasks. These allegations, too, fall short of the conduct pled in many cases where such claims were dismissed,[6] and fall shorter still of that pled in cases where such claims were sustained.[7]

---

[6] *See, e.g., Trachtenberg*, 937 F. Supp. 2d at 472–73 (allegations of plaintiff, a former teacher, that she was put under "excessive scrutiny," that the school principal would stand near plaintiff and attempt to intimidate her, that she received negative performance reviews and letters from the principal with "scurrilous charges," that she was moved to "a poorly ventilated, windowless office," and that she was "refused training opportunities" "fall well short" of alleging a hostile work environment); *Raum v. Laidlaw, Ltd.*, 173 F.3d 845 (2d Cir. 1999) (summary order) (affirming dismissal of hostile work environment claim where supervisor "repeatedly subjected [plaintiff] to obscene gestures and comments which caused [him] embarrassment and humiliation"); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 455 (S.D.N.Y. 2012) (granting motion to dismiss hostile work environment claim where plaintiff alleged three incidents over a year in which he had been chastised and berated in front of coworkers); *Smith v. Reg'l Plan Ass'n, Inc.*, No. 10 Civ. 5857 (BSJ) (KNF), 2011 WL 4801522, at *6 (S.D.N.Y. Oct. 7, 2011) (granting motion to dismiss where disabled plaintiff alleged six incidents of discriminatory treatment, such as being called "crippled" and a "lame duck"); *Mack v. Port Auth. of N.Y. & N.J.*, 225 F. Supp. 2d 376, 388–89 (S.D.N.Y. 2002) (finding allegations that supervisor called plaintiff a "boy," petty criticisms of nonwhite workers and disparate work assignment, and disparate enforcement of lunch and break limitations inadequate to plead race-based hostile work environment claim).

[7] *See, e.g., Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70–71 (2d Cir. 2000) ("[A] stream of racially offensive comments over the span of two to three months" including a physically threatening comment where the defendant "said he had a rope with which to hang a co-worker . . . sufficient evidence of a hostile work environment to survive summary judgment."); *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1098 (2d Cir. 1986) (daily use of racial epithets and "proliferation of racially derogatory 'literature' posted on bulletin board and walls throughout main thoroughfares," as well as confronting minority officers with "cartoons and 'doctored' photographs favorably portraying the Ku Klux Klan, offensive photographs of half-

The cases on which Myers relies do not rescue this claim. In *James v. New York City Health & Hospitals Corp.*, this Court denied a motion for summary judgment against a hostile work environment claim. No. 15 Civ. 6015 (PAE), 2017 WL 3923675, at *9 (S.D.N.Y. 2017). But the plaintiff there had "testified to numerous instances of consistent harassing behavior," including being followed around the workplace, an attempted touching, specific harassing statements, sexually aggressive incidents, and even physical assault. *Id.* There is nothing of the kind here, as the AC conclusorily alleges only hostile looks and Doherty's regular ignoring of Myers. In *Johnson v. Angels*, the court denied a motion to dismiss where the complaint alleged racially segregated bathroom facilities, a racially offensive portrait in the plaintiff's office, and the repeated use of racially offensive language and slurs in the plaintiff's workplace. 125 F. Supp. 3d 562, 567–68 (M.D.N.C. 2015). There is no remotely similar factual analog here.

The Court accordingly dismisses the AC's hostile work environment claim.

### E.     NYCHRL Claims

Having dismissed Myers's federal claims, the Court must determine whether to exercise supplemental jurisdiction over his remaining claims, which allege discrimination and retaliation under the NYCHRL. Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental

---

naked black men and women in African garb, a picture of a black man with a noose around his neck" sufficiently severe and pervasive to merit finding of hostile work environment).

jurisdiction" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. §
1367(c)(3).

In deciding whether to exercise supplemental jurisdiction, a district court is to balance the
traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon
Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Both the Second Circuit and the Supreme Court have
held that, as a general rule, "when the federal claims are dismissed the 'state claims should be
dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998)
(quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Had the AC's federal claims proceeded past the motion to dismiss stage into fact
discovery, there would have been some basis in judicial economy for the Court to exercise
supplemental jurisdiction over Myers's NYCHRL claims. But Myers's federal claims have been
dismissed at the threshold. And the dismissal of Myers's federal claims does not dictate the
dismissal of his NYCHRL claims, so as to favor reaching those claims in the interest of
economy. Although the statute of limitations for an NYCHRL claim is also three years, N.Y.C.
Admin. Code § 8-502(d), the continuing violation doctrine under the NYCHRL is broader than
under federal law. *See Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 250 (E.D.N.Y.
2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d
27, 35 (1st Dep't 2009)). Similarly, the substantive standards governing Myers's federal claims
differ from those under the NYCHRL: "[C]laims under the City HRL must be reviewed
independently from and 'more liberally' than their federal and state counterparts," *Loeffler v.
Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams*, 872 N.Y.S.2d at
31).

For these reasons, the Court, having resolved the complaint's federal law claims and found that they are not viable, finds that no circumstances counsel in favor of the Court's exercising supplemental jurisdiction over Myers's remaining claims.  The Court accordingly declines to exercise supplemental jurisdiction over the AC's NYCHRL claims, and dismisses these without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss the AC's federal claims.  That dismissal is with prejudice, as the AC was Myers's second complaint, and he has not identified any factual basis on which these claims may be rehabilitated.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  The Court declines to exercise supplemental jurisdictional over its NYCHRL claims.  These claims are dismissed without prejudice.[8]

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 19 and 29, and to close this case.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: November 30, 2021
       New York, New York

---

[8] Because the Court granted the motion to dismiss the § 1983 claims as against all defendants, the Court has no occasion to consider defendants' alternative argument that the AC fails to plausibly allege the personal involvement of defendants Beary or Kobel.  *See* Def. Mem. at 10; Def. Reply at 9–10.

30